Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1996 WL 431093
**(Cite as: Not Reported in F.Supp.)**

H

Not Reported in F.Supp., 1996 WL 431093
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Gary L. **SHOCKLEY**, Petitioner,
v.
Richard KEARNEY, Warden, and M. Jane Brady, Attorney General of the State of Delaware, Respondents.
**Civ. A. No. 95-207-SLR.**

July 25, 1996.

Gary L. Shockley, petitioner, pro se.
Loren C. Meyers, Esquire, Deputy Attorney General, and Gary A. Myers, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware, for respondents.

*MEMORANDUM OPINION*

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

Petitioner Gary Shockley filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 1, 1995. Petitioner seeks habeas corpus relief on the ground of ineffective assistance of counsel. (D.I. 2) Respondents have filed an answer, claiming that petitioner's difficulties at trial resulted from his own unwillingness to cooperate with his attorneys and his insistence on giving perjured testimony. Respondents urge the court to dismiss the petition without further proceedings. (D.I. 12) For the reasons stated below, the court will dismiss the petition and deny the requested relief. FN1

> FN1. Petitioner has also filed a "Renewed Motion for Appointment of Counsel." (D.I. 18) The court denied petitioner's previous motion for appointment of counsel on November 21, 1995. (D.I. 17) In his renewed motion, petitioner does not present any new or changed circumstances which would justify reconsideration. The motion, therefore, will be denied.

II. BACKGROUND

In September 1984, a grand jury indicted petitioner for the murder of his wife. (D.I. 7 at Ex. A) He was charged with one count of first degree murder, three counts of possession of a deadly weapon during the commission of a felony, and one count of possession of a deadly weapon by a prohibited person. Because the murder charge was a capital offense, the court appointed two public defenders, Karl Haller and Howard Hudson, to represent petitioner. (D.I. 12 at 9)

After meeting with petitioner, petitioner's attorneys advised him to pursue an extreme emotional distress defense. According to petitioner's own testimony at his Rule 61 hearing, he agreed. (D.I. 14) On the advice of counsel, petitioner met with Dr. Cono A. Galliani, Ph.D., a psychologist, for the purpose of "exploring the feasibility of a mental illness defense." (D.I. 7 at Ex. H) Their meeting took place on November 16, 1984. According to the psychologist's report, petitioner admitted stabbing his wife and recounted details of the incident to Dr. Galliani. (D.I. 7 at Ex. H)

On May 21, 1985, petitioner was examined by a second psychiatric expert, Dr. George E. Voegele. (D.I. 7 at Ex. I) According to Dr. Voegele's report, petitioner stated that he had been drinking heavily the day before the murder and claimed not to remember anything about the day of the murder. He stated that he knew he had not killed his wife. In his report, Dr. Voegele expressed his disbelief of petitioner's claim of amnesia. (D.I. 7 at Ex. I) The State received both experts' reports in response to discovery requests. (D.I. 14) Neither expert report was admitted at trial, nor did either psychological expert testify. (D.I. 7 at Ex. D)

Petitioner also submitted to a blood test before trial. The purpose of the test was to determine whether petitioner was the father of his sister-in-law's child.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 431093
**(Cite as: Not Reported in F.Supp.)**

Page 2

According to the State, petitioner's wife's anger over the pregnancy of her 15-year-old sister and her belief that petitioner was the father sparked the argument that led to the murder. (D.I. 14) Petitioner states that he knew the results of the test would be admissible in court, but contends that his attorneys gave him no advice on whether to submit to the test. (D.I. 14)

On August 26, 1985, the court met in chambers with counsel and petitioner. (D.I. 14) Petitioner's counsel, Mr. Haller, informed the court that petitioner had refused to cooperate with his attorneys, that he refused to tell them the names of witnesses and that he had expressed a desire to represent himself. When questioned directly by the court, petitioner stated that he did not wish to have either of his court-appointed attorneys present at his trial. He complained that his counsel had not been in frequent enough contact with him, and that they had released the two psychological reports to the prosecutor, which he considered a breach of confidentiality. Petitioner requested the court to appoint different attorneys to represent him. In response, the court offered petitioner three options: he could continue to have both Mr. Haller and Mr. Hudson represent him, or he could have either of them present as an advisor if he chose to represent himself. Petitioner chose to represent himself, with Mr. Hudson as an advisor. (D.I. 14)

Later that day, petitioner changed his mind and asked to have Mr. Hudson officially represent him. (D.I. 14) The court continued the trial to give Mr. Hudson time to prepare. In the interim, petitioner refused to cooperate with Mr. Hudson and petitioned the court on September 5, 1985 to have him removed as counsel. (D.I. 7 at Ex. E) The court refused, noting that petitioner's only complaint about his counsel appeared to be counsel's decision not to call some of the witnesses petitioner had requested.

When the trial resumed, petitioner notified the court that he did not wish Mr. Hudson to represent him. The court ordered Mr. Hudson to stand by as an advisor. Petitioner then addressed the jury, asserting that he had not received adequate representation from his attorneys and claiming that he could not represent himself.

Therefore, he stated, he would "plead the Fifth" until the court appointed new counsel for him. (D.I. 14) The State presented its case; petitioner made no objections and did not cross-examine any of the State's witnesses. (D.I. 14) During a recess on the first day of trial, the court met again in chambers with petitioner, Mr. Hudson, and Mr. Haller. They persuaded petitioner to allow Mr. Haller to represent him. Mr. Haller then recalled several of the State's witnesses back to the stand for cross-examination. (D.I. 14)

One of the witnesses for the State, James L. Hitchens, testified that petitioner had telephoned him shortly after the murder and confessed to killing his wife. In response to the prosecutor's question about whether he recognized petitioner's voice on the telephone, the witness replied, "Yes, I guess. Yeah." (D.I. 14) Petitioner's counsel objected twice during Mr. Hitchens' testimony, on the ground that the State had not laid a proper foundation. After the first objection, the prosecutor withdrew his question; the second was overruled. During cross-examination, petitioner's counsel explored the witness's uncertain response as to his identification of petitioner's voice:

Q. When did this conversation take place?
A. I don't know the date.
Q. Can you give us a season?
A. It was probably six or eight weeks after it happened, I guess. I don't know, really.
Q. Was it early in the morning or late at night?
A. At night.
Q. Late?
A. I don't know.
Q. Do you remember whether you had awoken or whether you had anything to drink, or anything like that?
A. No.
Q. Mr. Sandy asked you if you recognized the voice of the person, and your first response was "I guess." Are you absolutely certain that was Gary Shockley, or is that just your best guess?
A. If you don't see anybody, you can't actually be sure, but, supposedly, it was.
Q. If you are sure, say you are sure. If you are not sure, say you are not sure.
A. I am not sure then.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 431093  
**(Cite as: Not Reported in F.Supp.)**

Page 3

(D.I. 14)

At the close of the State's evidence, petitioner's counsel made several motions, including a motion to dismiss Count V of the indictment, possession of a weapon by a person prohibited. Counsel argued that "it is prejudicial to have this Count that charges a prior felony joined into the other Counts, in that it contaminates the jury as to prior record. The best way to cure this at this point in the proceeding would be to dismiss Count V and give the curative instruction to the jury to disregard any testimony regarding the prior record." (D.I. 14) In response, the prosecutor argued that it would be improper for the court to dismiss Count V, after jeopardy had attached, as a substitute for an earlier motion to sever, which petitioner had not made. The court denied petitioner's motion. (D.I. 14)

At an in-chambers conference during the trial, petitioner's counsel requested to speak *ex parte* with the court, citing Rule 3.3 of the Delaware Lawyers' Rules of Professional Conduct. FN2 Counsel informed that court that, despite petitioner's earlier repeated admissions that he had in fact killed his wife, he planned to take the stand and "testify to a version of events which I know not to be true." (D.I. 14) Counsel requested the court's leave to withdraw from the case, or in the alternative, guidance on how to proceed. The court denied the motion to withdraw, and advised counsel, in accordance with the Rules, to permit petitioner to testify in narrative form. Such a solution, the court noted, "satisfies [petitioner's] constitutional right to counsel and also satisfies the ethic requirements imposed upon defense counsel...." (D.I. 14)

> FN2. Rule 3.3 states, in relevant part:
> (a) A lawyer shall not knowingly:
> (1) make a false statement of material fact or law to a tribunal;
> (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
> ....
> or (4) offer evidence that the lawyer knows to be false.....
> (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
> (d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

Because of this expected difficulty concerning petitioner's testimony, and because Mr. Haller, petitioner's lead counsel, had not been present for the whole of the State's case, counsel declined the opportunity to make an opening statement after the State rested. (D.I. 14) Before putting petitioner on the stand, defense counsel called Margaret R. Taylor, petitioner's mother. Although counsel was aware that petitioner was likely to testify that he did not commit the murder, counsel asked questions of Ms. Taylor apparently designed to elicit testimony about petitioner's emotional state, including information about petitioner's heavy drinking, his suicide attempts, and his use of a knife the night before the murder to make a serious cut in his own arm. In a sidebar conference, Mr. Haller made clear his strategy:

> Mr. Hudson and I are trying to do as good a job as we can under the circumstances.... Earlier in this case, we had advanced the emotional distress argument. We feel that, under the circumstances and without certainty as to what the witness is going to say, we have an obligation to Mr. Shockley and the Court to probe into that area to see whether there are elements of emotional distress.

(D.I. 14) Ms. Taylor also testified that she did not believe her son had committed the murder. (D.I. 14) At petitioner's specific request, defense counsel questioned Ms. Taylor on redirect about a Mr. Bates, who, according to petitioner, was the real murderer. Petitioner also directed counsel to ask what had been discussed during a meeting between Ms. Taylor and the prosecuting attorney. (D.I. 14) In response to these questions, and to related questions asked during re-cross, the witness stated that the prosecutor had told her that he believed petitioner was guilty. In this context, the witness also made mention of the first

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 431093  
**(Cite as: Not Reported in F.Supp.)**

Page 4

psychiatric expert's report, but the fact that petitioner had admitted stabbing his wife to that expert was not revealed. The report was not admitted into the record. (D.I. 14)

After the testimony of his mother, petitioner took the stand. As directed by the court, counsel asked only preliminary questions on direct examination and allowed petitioner to testify in narrative form. Petitioner testified that he had spent most of the day of the murder in a local park with some friends. At one point, he claimed, he went to his mother's house, where he and his wife were staying, but no one answered when he announced himself. Concluding that his wife was not at home, petitioner claimed that he returned to the park, where he was later arrested.

In its rebuttal case, the State offered the testimony of several police officers to refute petitioner's claim that he was intoxicated when he made certain incriminating statements to police. One of the officers, during the State's case in chief, had testified that petitioner told him "I may have killed her, but if I did, I don't remember." Defense counsel did not offer any evidence, aside from the testimony of petitioner himself, that petitioner had denied the killing outright during interviews with police. (D.I. 14) Petitioner currently claims that he made such denials during taped interviews with police. FN3

> FN3. No tape or transcript of these interviews has ever been offered into evidence in any of the state court proceedings or in support of the present petition. At his state post-conviction hearing petitioner did introduce handwritten notes concerning taped statements, but was unable to state whose they were. His attorney, Mr. Haller, testified that the handwriting was not his. Despite the paucity of information in this area, the court will assume that petitioner did in fact make statements to the police to the effect that he was not responsible for his wife's death.

During the State's closing argument, the prosecutor attacked the plausibility of petitioner's alibi testimony and his claim that someone else had committed the murder. (D.I. 14) He emphasized the inculpatory statements petitioner had made to James Hitchens and petitioner's statement to police that "I may have done it but I don't remember." (D.I. 14) The prosecutor also used the results of the paternity test to impugn petitioner's credibility:

> Would Gary Shockley know what the truth was if it came up and bit him on the leg? You heard him testify....
> Gary Shockley looked you right square in the eye. Turned towards you. Looked you up and down and said, "I didn't kill her. I love my wife." Gary Shockley looked [his wife's sister] right in the eye and said, "I never touched you" and told his wife, "I didn't do it. She is making it up. I didn't touch her. I will prove it. I will go get a paternity test...."
> So after this all happened the defense has a paternity test done..... There is less than one chance in one hundred that Gary Shockley isn't the father of that baby. And just as he looked [his wife's sister], the 14-year-old mother of that baby, in the eye and denied that he touched her, he looked you in the eye and denied that he killed Donna Shockley.

(D.I. 14) After the State's summation, petitioner's counsel chose not to make a closing argument to the jury. Mr. Haller later explained that he had ethical concerns about basing an argument on what he felt strongly was perjured testimony from his client. (D.I. 14) On the other hand, petitioner had made clear his wish not to present an extreme emotional distress defense. Finding himself on such shaky ground, counsel decided that a weak argument from the defense-and what he predicted would be an aggressive rebuttal from the prosecution-would be worse for petitioner than no closing argument at all. (D.I. 14)

Although the record before this court does not include the charge to the jury, it is undisputed that the court did not instruct the jury on the defense of extreme emotional distress, nor did defense counsel request such an instruction. Respondents also contend, and petitioner does not deny, that instructions were given on alibi, second degree murder, and manslaughter in addition to first degree murder. (D.I. 12 at 35)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 431093  
**(Cite as: Not Reported in F.Supp.)**

Page 5

The jury convicted petitioner on all counts on October 4, 1985. The court sentenced him to life plus ninety-five years. Mr. Haller filed a timely appeal on petitioner's behalf. In the appeal, petitioner argued that he was denied his right to an impartial jury, that the trial court erroneously permitted the prosecutor to express his opinion as to petitioner's guilt, and that petitioner's inculpatory statements were improperly admitted at trial. On September 19, 1986, the Supreme Court of Delaware affirmed the convictions. (D.I. 7 at Ex. C)

With the assistance of private counsel, petitioner filed a motion for Rule 61 postconviction relief before the Superior Court for Sussex County. In that motion, petitioner claimed that the representation he had received from his two court-appointed attorneys had been constitutionally deficient. Specifically, petitioner claimed that counsel erred by not making an opening statement or closing argument, by not objecting to the testimony of James Hitchens, by revealing the contents of the psychological experts' reports to the State, by not assisting petitioner to prepare his testimony, and by not moving for severance of Count V, possession of a deadly weapon by a person prohibited. FN4

> FN4. These specific complaints mirror exactly those at issue in the present petition.

A hearing was held on October 23, 1987. Mr. Haller testified that he based his decision not to move before trial for severance of Count V on the fact that defense counsel filed eight other motions, all of which, in his estimation, had a better chance of assisting petitioner's case than severance motions, which are rarely granted. (D.I. 14) As detailed above, Mr. Haller also explained the reasons for the narrative form of petitioner's testimony and the decision to forego closing argument.

The court denied petitioner's motion for postconviction relief on March 9, 1988. (D.I. 7 at Ex. D) The Delaware Supreme Court, in a lengthy and detailed opinion, affirmed. (D.I. 7 at Ex. E) Petitioner filed a second motion for postconviction relief, which was denied as untimely by the Superior Court in 1993.

(D.I. 7 at Ex. F) The Supreme Court again affirmed. (D.I. 7 at Ex. G)

### III. DISCUSSION

#### A. Exhaustion Requirement

Before the court can review petitioner's claims, the court must ascertain whether petitioner has exhausted all available state remedies. 28 U.S.C. § 2254(b). The requirement that a petitioner exhaust all available state remedies prior to seeking federal habeas corpus relief is statutorily mandated under 28 U.S.C. § 2254(b) and (c). Comity is the rationale underlying the exhaustion requirement, which allows state courts the first opportunity to pass on alleged defects in the criminal proceedings leading to the conviction at issue. Recognizing that principles of federal-state comity must restrain unnecessary "[f]ederal intrusions into state criminal trials," *Engle v. Isaac,* 456 U.S. 107, 128 (1982), the United States Supreme Court has held that the exhaustion requirement must be "rigorously enforced." *Rose v. Lundy,* 455 U.S. 509, 518 (1982); *see also Santana v. Fenton,* 685 F.2d 71, 77 (3d Cir.1982), *cert. denied,* 459 U.S. 1115 (1983).

To exhaust state remedies, a petitioner must have raised before the highest state court the factual and legal premises of the claims for relief he asserts in the federal proceeding. *Chaussard v. Fulcomer,* 816 F.2d 925 (3d Cir.), *cert. denied,* 108 S.Ct. 139 (1987) ; *Gibson v. Scheidemantel,* 805 F.2d 135, 138 (3d Cir.1986).

Petitioner's claims in the present petition are identical to those he raised in his Rule 61 motion before the state courts. His claims, therefore, have been exhausted.

#### B. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, petitioner must show both that (1) his counsel's performance fell below an objective standard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of reasonableness and (2) there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 686 (1984); *Darden v. Wainwright,* 477 U.S. 168, 184 (1986); *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986); *Burger v. Kemp,* 483 U.S. 776, 788-89 (1987). Moreover, in order to obtain a hearing in a federal habeas corpus proceeding, a petitioner has to allege in his application for relief facts which, if shown to be true, would entitle him to relief. *Townsend v. Sain,* 372 U.S. 293, 312 (1963); *Bibby v. Tard,* 741 F.2d 26, 30 (3d Cir.1984). Therefore, in the Sixth Amendment context, petitioner is required to allege not only the derelictions of his counsel, but how these errors undermined the reliability of the convictions. *See, e.g., Hill v. Lockhart,* 474 U.S. 52, 60 (1985) (denying petition due to absence of factual allegation of prejudice). *Cf. Mayberry v. Petsock,* 821 F.2d 179, 185-86 (3d Cir.), *cert. denied,* 484 U.S. 946 (1987) (specific allegations required in habeas petition as precondition for further proceedings).

In determining whether counsel's actions were reasonable, the court must give considerable deference to the attorney:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S. at 688-789 (emphasis added), quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955).

Petitioner asserts, in general, that there was a "complete breakdown of the adversarial relationship" and that "for whatever reason, the defense counsel failed to participate in substantial portions of the trial." (D.I. 6 at 10) In addition to this general claim, petitioner alleges twelve specific instances of ineffective assistance: 1) counsel's failure to make an opening statement; 2) failure to make a closing argument; 3) refusal to assist petitioner with his testimony; 4) eliciting evidence of petitioner's emotional distress from a witness after petitioner manifested his intention to abandon that defense; 5) failure to request a jury instruction on emotional distress; 6) turning over copies of the psychological experts' reports to the State; 7) failure to advise petitioner on whether to submit to a blood test; 8) failure to make a proper objection to James Hitchens' identification of petitioner's voice; 9) failure to make a timely motion to sever Count V; 10) eliciting testimony from a witness as to the prosecutor's opinion of petitioner's guilt; 11) failure to introduce evidence of petitioner's denials of guilt during interviews with police; and 12) inadequate assistance on appeal, including counsel's decision to forego oral argument.

### 1. General Allegation of Ineffectiveness

As a general matter, petitioner contends that his attorneys were so incompetent, and his relationship with them so dysfunctional, as to amount to a complete, constructive denial of counsel altogether. He cites *Javor v. United States,* 724 F.2d 831 (9th Cir.1984), in which the court held that no separate showing of prejudice was necessary where petitioner's counsel had slept through most of his trial. The court reasoned that "[p]rejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all." *Id.* at 834. Likewise, petitioner claims, counsel in this case was "asleep at the switch." (D.I. 15 at 2)

The differences between the actions of counsel in this case and those discussed in *Javor* could scarcely be more stark. The record indicates that Mr. Hudson and Mr. Haller actively participated in every phase of trial to the extent that petitioner allowed them to do so. Mr. Hudson was present even when petitioner was technically representing himself, and both attorneys played a role in persuading petitioner to accept their assistance. In short, the record simply does not

Not Reported in F.Supp.  Page 7
Not Reported in F.Supp., 1996 WL 431093
**(Cite as: Not Reported in F.Supp.)**

support petitioner's assertion that he was effectively denied the assistance of counsel through the inaction of his attorneys.

### 2. Specific Allegations

As discussed above, except in extreme cases involving such factors as the physical absence or unconsciousness of counsel, a petitioner seeking habeas corpus relief on the grounds of ineffective assistance of counsel must point to specific acts or omissions. He must show that counsel's actions were objectively unreasonable and that he was prejudiced by them. The court will address each of petitioner's specific allegations in turn.

#### a. Failure to Make a Timely Motion to Sever Count V

Petitioner contends that, due to counsel's ineffectiveness, Count V, possession of a weapon by a person prohibited, was tried along with the other counts of the indictment. As a result, petitioner claims, the jury learned of petitioner's prior criminal history. During the trial, counsel did move for dismissal of Count V, and raised arguments similar to the ones petitioner now makes concerning prejudice. The State argued in response that dismissal, after jeopardy had attached, would be improper, and noted that defendant had failed to move earlier to sever Count V. Later, during the hearing in Superior Court on petitioner's motion for Rule 61 postconviction relief, Mr. Haller recounted that he had not moved for severance before trial because he thought that counsel's time would be better spent on motions that were more likely to succeed. Motions to sever, he explained, were rarely granted.

Petitioner does not make any showing that the court would have granted a motion to sever. Nor has he established that such severance would have affected the outcome of the trial. The jury already knew of his prior conviction through the testimony of several witnesses; in fact, petitioner's status as a furloughed prisoner formed a central part of the State's theory of the case. It is likely that the fact, if not the details, of petitioner's criminal record would have come to the jury's attention even if Count V had been severed. The court concludes, therefore, that counsel's decision not to move for severance was neither unreasonable nor prejudicial to petitioner.

#### b. Failure to Advise Petitioner on Whether to Submit to a Paternity Test

Petitioner claims that counsel erred seriously in not advising him whether to submit to a blood test. The results of that test demonstrated a 99.19% likelihood that petitioner was the father of his wife's fourteen-year-old sister's baby. The State used this evidence to explain to the jury why petitioner and his wife were fighting during the time leading up to the murder. The prosecutor also used the test results, along with testimony that petitioner had denied paternity, to cast doubt on petitioner's overall credibility during closing argument.

Although the admission of the results certainly cast doubt on petitioner's credibility and likely bolstered the State's case, the court finds that counsel did not act unreasonably in this instance. Although petitioner now claims that counsel gave him no advice on whether to submit to the test, he testified at his Rule 61 hearing that "[Mr. Haller] might have written me a letter. I don't remember. But they did tell me that it would be admissible in Court. But that was if they ever charged me with the rape charge. He didn't tell me they could use it in the murder charge against me." (D.I. 14) From this testimony, the court can infer that counsel did advise petitioner on this matter, and despite knowing that a positive result could result in an additional charge of rape, petitioner chose to take the test.

Even if counsel had actively advised petitioner to submit to the blood test, such advice would not have been unreasonable in light of petitioner's persistent denials of paternity. A negative result could have bolstered petitioner's credibility. In addition, at the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 431093  
**(Cite as: Not Reported in F.Supp.)**

Page 8

time petitioner submitted to the test, counsel was attempting to pursue a defense based on extreme emotional distress. A false accusation of such a terrible act from petitioner's wife would fit into the picture counsel was trying to create for the jury.

c. Disclosure of Experts' Reports to the State

Petitioner contends that by disclosing the reports of the psychiatric experts who examined petitioner to the State, counsel violated an attorney-client confidence, provided the prosecutor the means with which to impeach petitioner's alibi testimony, and irreparably breached the bond of trust between petitioner and his attorneys. Petitioner disputes that the State was entitled to the reports under the discovery rules and argues that counsel should not have voluntarily turned them over. Instead, counsel should have put the State through its paces, forcing the prosecutor to demonstrate before the court that the reports met the requirements for reciprocal disclosure under the Superior Court Rules of Criminal Procedure.

The court concludes that turning the reports over to the State was well within the bounds of reasonable and effective representation. At the time counsel made the reports available to the State, petitioner still intended to present an extreme emotional distress defense. The reports contained support for that claim, and as such were clearly material.

In addition, petitioner suffered no prejudice from the State's possession of the information in the reports. The reports were never admitted into evidence. Neither expert testified at trial. Although the first expert's report was mentioned briefly during the State's cross-examination of petitioner, its contents were never revealed to the jury. As to petitioner's claim that the disclosure of the reports disrupted the attorney-client relationship, the court finds this argument unconvincing. Counsel acted properly in disclosing the reports to the State. No client confidences were breached. If petitioner chose to become uncommunicative and uncooperative based on his subjective impression as to the propriety of counsel's acts, petitioner must bear the responsibility for that choice.

d. Refusal to Assist Petitioner with His Testimony

Petitioner claims that counsel unreasonably concluded that he was lying when, after telling his attorneys and a psychologist that he had killed his wife, he stated his intention to testify that he had an alibi. To support this claim, petitioner points to exculpatory statements he allegedly made to police following his arrest, and to promises he claims were made to him that if he cooperated with an extreme emotional distress defense he would escape capital punishment and receive a lighter sentence. Therefore, petitioner argues, counsel acted unreasonably by failing to assist petitioner in preparing and giving his alibi testimony. Somewhat inconsistently, petitioner also argues that counsel should have attempted to dissuade him from taking the stand. Notably, in his reply brief, petitioner appears to admit that his testimony was indeed perjurious. (D.I. 15 at 6) He argues, however, that "the 'remedy' for [petitioner's] perjury is prosecution for perjury" rather than the deprivation of a fair trial.

The right to effective counsel does not include the right to present perjured testimony. *Nix v. Whiteside,* 475 U.S. 157 (1986). In *Nix,* a defendant on trial for murder had told his attorney that he was convinced his victim had a gun, but that he had not seen it. Shortly before he was to testify, however, the defendant announced to his attorney his intention to say that he had seen "something metallic" in the victim's hand. The attorney informed his client that he could not suborn perjury, and that if he persisted in his intention to lie on the stand, he would notify the court and ask to withdraw from the case. *Id.* at 160-61. When defendant took the stand, he testified only that he "knew" the victim had a gun, but admitted on cross-examination that he had not seen it. He was convicted of second degree murder. In his petition for habeas corpus, he argued that his attorney's threat to notify the court and withdraw from the case deprived him of his right to counsel. In its reversal of the circuit court's decision in petitioner's favor, the Supreme Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 9
Not Reported in F.Supp., 1996 WL 431093
**(Cite as: Not Reported in F.Supp.)**

held:
> [T]he legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence. This special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice.

*Id.* at 168-69. The Court also stated that had the attorney in *Nix* carried out his threats to withdraw and to inform the court of his client's perjury, his actions would have been perfectly proper. *Id.* at 169-70.

In *Strickland,* the Supreme Court cited the Model Rules of Professional Conduct, on which the Delaware Rules are based, and discussed the usefulness of "prevailing norms of practice as reflected in American Bar Association Standards and the like" as guides (albeit not ironclad ones) for determining whether an attorney's assistance was objectively reasonable. *Strickland,* 466 U.S. at 688. In this case, petitioner's counsel followed the Delaware Lawyers' Rules of Professional Conduct: Mr. Haller notified the court, *ex parte,* that he was satisfied "beyond a reasonable doubt" that his client intended to commit perjury. When the court refused his request to withdraw from the case, counsel did exactly as instructed by the court and the Delaware Rules: he allowed his client to testify in narrative form.

The Supreme Court of Delaware, in its review of the Superior Court's denial of postconviction relief, made a specific finding that "th[e] record [is] sufficient to sustain defense counsel's belief 'beyond a reasonable doubt' that Shockley's testimony concerning his wife's death would be perjurious." (D.I. 7 at Ex. E20) Given the evidence on record, and the fact that petitioner does not deny that he committed perjury, this court agrees with the state court's determination. In such difficult circumstances, petitioner's counsel, Mr. Haller, conducted himself according to the established norms of the profession. Any prejudice to petitioner resulted not from any fault in counsel's assistance, nor from petitioner's exercise of his right to testify in his own behalf, but from petitioner's decision to testify falsely.

### f. Failure to Make an Opening Statement or Closing Argument

Petitioner claims that counsel acted unreasonably in failing to make either an opening statement or a closing argument to the jury. Because of this failure, petitioner contends, counsel had no opportunity to point out the weaknesses in the State's case, no chance to discuss and emphasize the presumption of innocence, and no forum for communicating directly with the jury. To underscore the importance of argument, especially closing argument, petitioner cites *Herring v. New York,* 422 U.S. 853 (1975), in which the Supreme Court held that the Sixth Amendment forbids the denial of an opportunity for closing argument to a criminal defendant. The question here, however, is not whether petitioner was denied an opportunity for argument; it is whether his counsel acted reasonably in waiving the right on petitioner's behalf. In light of the circumstances, the court concludes that counsel did act reasonably.

Petitioner's insistence on testifying that he had an alibi, as well as his general lack of cooperation with his counsel, appear to be largely responsible for the fact that the jury heard no argument on petitioner's behalf. At the start of the trial, petitioner refused the assistance of his appointed counsel and chose to speak for himself. After changing his mind and allowing Mr. Haller to represent him, petitioner announced his intention to testify that he had an alibi. When counsel was offered the opportunity to make an opening statement after the State rested, it was still unclear whether petitioner would go through with the alibi testimony, or whether he would eventually fall back on an extreme emotional distress defense. Having no clear idea what petitioner would say, and wary of the ethical dilemma that was developing, counsel chose to forego an opening statement. Under the circumstances, this was a coherent and reasonable strategy choice.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 10
Not Reported in F.Supp., 1996 WL 431093
**(Cite as: Not Reported in F.Supp.)**

Similarly, counsel's waiver of closing argument must also be seen in the light of petitioner's perjured testimony. Forbidden by the rules of professional conduct from aiding his client in committing perjury, counsel did not wish to lend credibility to petitioner's alibi testimony by basing a final argument on it. On the other hand, petitioner had made quite clear his wish that counsel not argue extreme emotional distress. Furthermore, petitioner's testimony had been weak, implausible, and riddled with internal contradictions, which the prosecutor had fully exploited on cross-examination and during argument. It is true, as petitioner points out, that counsel could have used closing argument to reinforce the concepts of the presumption of innocence and reasonable doubt. However, counsel had to weigh against that opportunity the wisdom of allowing the State its rebuttal. Although counsel's decision to remain silent was unconventional, it was a reasonable response to the unconventional circumstances of the case.

g. Testimony about Prosecutor's Opinion of Guilt

While Ms. Taylor was testifying, petitioner specifically instructed his counsel to ask her about a meeting she had with the prosecutor, and to have the witness identify Mr. Bates. Ms. Taylor's answers to these questions revealed that the prosecutor had told her, based on the contents of the psychological report, that he believed petitioner was guilty. When the prosecutor attempted to expand on these statements, counsel objected. Although the court held that defendant had opened the door to testimony about the prosecutor's opinion, the contents of the psychologist's report were not revealed to the jury.

Petitioner now faults his attorney for doing exactly what he asked. He claims that when petitioner suggested asking the questions about Bates and Ms. Taylor's meeting with the prosecutor, counsel should have known that these questions would elicit damaging testimony and advised petitioner to that effect. It is not clear exactly how counsel could have predicted this. In general, a client who explicitly directs his attorney to employ a certain tactic or defense cannot then claim ineffective assistance when the tactic does not work. *United States v. Masat,* 896 F.2d 88, 92-93 (5th Cir.1990) ; *Mulligan v. Kemp,* 771 F.2d 1436, 1441 (11th Cir.1985), *cert. denied,* 480 U.S. 911 (1987). As the Eleventh Circuit noted in *Mulligan:*

> [A] defendant's Sixth Amendment rights are his alone, and ... trial counsel, while held to a standard of "reasonable effectiveness," is still only an assistant to the defendant and not the master of the defense.... Because we recognize that a defendant must have this broad power to dictate the manner in which he is tried, it follows that, in evaluating strategic choices of trial counsel, we must give great deference to choices which are made under the explicit direction of the client.

*Id.* at 1441 (emphasis in original). Employing such deference, the court concludes that the questions asked of Ms. Taylor were well within the bounds of reasonably competent assistance.

The testimony elicited as a result of counsel's questions, furthermore, was not sufficiently prejudicial to petitioner to support a finding that counsel was ineffective. The jury never discovered that the psychologist's report to which Ms. Taylor referred contained an admission of guilt. As to the prosecutor's opinion, although prosecutors are generally prohibited from interjecting an opinion of defendant's guilt during trial, the mere knowledge that the prosecutor in this case thought petitioner was guilty is unlikely to have affected the outcome or fundamental fairness of the trial.

h. Introduction of Evidence of Petitioner' Mental State

Petitioner objects to counsel's questioning of Ms. Taylor as to petitioner's mental state on the days leading up to the murder. That testimony, petitioner points out, revealed to the jury that petitioner had previously made use of a knife (to hurt himself) and that he and his wife had a heated, physical fight on the night before the murder. Petitioner contends that at the time Ms. Taylor testified, counsel knew that petitioner intended to testify to an alibi. Even if counsel

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 431093  
**(Cite as: Not Reported in F.Supp.)**

Page 11

reasonably thought the alibi testimony was perjurious, petitioner argues, counsel was not under any duty to present a defense that conflicted with the story petitioner was about to tell.

In this instance as well, the court finds the actions of counsel reasonable. At the time counsel elicited the testimony about petitioner's mental state from petitioner's mother, petitioner had not yet testified. In light of the many changes of heart (and of story) petitioner had expressed up to that point, it was still possible that petitioner would abandon his plan to present an alibi and allow his attorneys to argue extreme emotional distress.

Even though petitioner did not abandon his alibi story, there is no indication that Ms. Taylor's testimony prejudiced petitioner in any way. Several other witnesses testified to the acrimony between petitioner and his wife, and at least one remembered seeing him with a knife on the day of the killing. Indeed Ms. Taylor's testimony about petitioner's apparent alcohol addiction and depressed state could well have inspired some sympathy among the members of the jury. The court concludes, therefore, that counsel's decision to ask petitioner's mother questions about petitioner's mental state does not constitute ineffective assistance.

### i. Failure to Request Instruction on Extreme Emotional Distress

Petitioner contends that, having elicited testimony from Ms. Taylor on petitioner's mental state, counsel should have requested an instruction to the jury on the defense of extreme emotional distress.

By the time the court charged the jury, petitioner had already presented his alibi testimony. Unlike the situation that existed when counsel was questioning petitioner's mother, there was no longer any doubt that petitioner wished to abandon the defense of extreme emotional distress, and that he thought such a defense inconsistent with and prejudicial to his alibi defense. In this instance, counsel chose to follow the explicit wishes of the client. As noted above, actions of counsel taken pursuant to explicit instructions of a client are entitled to considerable deference. *Masat,* 896 F.2d at 92; *Mulligan,* 771 F.2d at 1441-42. The court concludes that counsel acted reasonably in discarding a defense that petitioner did not wish to pursue, and that not asking for a jury instruction on emotional distress was consistent with such a decision.

### j. Failure to Object to the Testimony of James Hitchens

Petitioner claims that "[t]rial counsel did not make proper objection, move to strike, nor move for voir dire outside the presence of the jury" after Mr. Hitchens expressed uncertainty as to his identification of petitioner's voice. The transcript reveals, however, that counsel objected twice during the State's direct examination and was overruled. Furthermore, counsel exploited the witness's uncertainty as to the identification issue fully on cross-examination. Although a request to conduct voir dire and a motion to strike were within the realm of things counsel could have done, that does not mean that counsel acted unreasonably in doing what he did. As to prejudice, judging from the court's overruling of counsel's objections, it is not likely that a motion to strike would have been successful, or that voir dire would have proven useful. Absent such a showing, petitioner cannot succeed in his contention that he was prejudiced by counsel's failure to move to strike or conduct voir dire.

### k. Failure to Introduce Evidence of Petitioner's Exculpatory Statements

At trial, one of the police officers who had spoken with petitioner after his arrest testified that petitioner told him "I may have done it but I don't remember." Petitioner claims that, to counter this testimony and that of James Hitchens, counsel should have introduced the taped statements in which petitioner claims he denied committing the murder. During the hearing on petitioner's Rule 61 motion, Mr. Haller testified that he did not recall the existence of any such taped

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 12
Not Reported in F.Supp., 1996 WL 431093
**(Cite as: Not Reported in F.Supp.)**

statements. When petitioner showed Mr. Haller some handwritten notes, ostensibly reflecting the content of petitioner's statements, Mr. Haller testified that he did not recognize them and that they were not in his handwriting. Petitioner has not, either in this petition or in his Rule 61 motion, produced the tapes themselves or transcripts of them.

Assuming that petitioner did make the claimed denials, the court cannot say that counsel acted unreasonably in not introducing them. As discussed in detail above, counsel had valid ethical concerns about lending credence to petitioner's untruthful testimony. Even in the absence of such ethical concerns, a decision not to introduce yet another conflicting version of the events surrounding the murder falls within the range of reasonable trial strategy.

Moreover, petitioner has not demonstrated prejudice resulting from counsel's decision in this regard. Throughout the trial, the jury heard several different versions of petitioner's story, ranging from his confession to Mr. Hitchens to his alibi testimony. The jury chose to believe the confession. It is not at all clear that they would have found otherwise had they heard petitioner's previous denials; it is just as likely, if not more so, that the evidence would have further undermined petitioner's credibility.

1. Inadequate Assistance on Appeal

Petitioner contends that the assistance of his counsel was constitutionally inadequate at the appellate level as well. He cites, specifically, counsel's failure to meet with him before filing the appeal, counsel's decision not to raise issues which petitioner thought important, and counsel's waiver of oral argument. At petitioner's Rule 61 hearing, Mr. Haller testified about his strategy on appeal. He stated that it was his regular practice to waive oral argument because, in his experience, "[t]he matter is going to be decided on the briefs." (D.I. 14) Such decisions are particularly within the realm of Mr. Haller's expertise as a public defender. The court cannot say his decision in this regard fell outside the realm of reasonableness. With respect to the issues chosen for the appeal, petitioner criticizes counsel's choice of issues but makes only the vaguest of suggestions as to what issues he claims should have been raised:

> Issues which should have been brought up include the irregularities in the early part of the proceeding in which the defendant was denied his right to counsel. An argument should have been made concerning the admissibility of the alleged statement that defendant made to Jimmy Hitchens since no proper foundation was able to be laid for that.

(D.I. 6 at 46-47) Petitioner has made no showing that these vaguely defined issues would have had a greater chance of success on appeal that those chosen by Mr. Haller. The court concludes, therefore, that counsel's representation of petitioner on appeal falls within the range of reasonableness.

### IV. CONCLUSION

Given the burdens placed on Mr. Haller and Mr. Hudson by a difficult case and a distrustful client, the court finds that they behaved reasonably under the circumstances. Petitioner's problems were largely of his own making. The petition, therefore, will be dismissed and the writ denied. An appropriate order will be entered.

D.Del.,1996.
Shockley v. Kearney
Not Reported in F.Supp., 1996 WL 431093

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.